SYMANTEC CORPORATION, Delaware corporation; and Quarterdeck Corporation, a Delaware corporation, Plaintiffs,

v.

CD MICRO, INC., an Oregon corporation; and Vincent L. Webb, an individual, Defendants.

CD Micro, Inc., an Oregon corporation; and Vincent L. Webb, an individual, Counterclaim Plaintiffs,

v.

Symantec Corporation, a Delaware corporation; and Quarterdeck Corporation, a Delaware corporation, Counterclaim Defendants.

CD Micro, Inc., an Oregon corporation; and Vincent L. Webb, an individual, Cross–Claim Plaintiffs,

v.

Warner–Elektra–Atlantic Corporation, a corporation having a principal place of business in New York, NY; MRT, a corporation having a principal place of business in the City of Industry, CA: Ritek Global Media, a corporation having a principal place of business in the City of Industry, CA; Optimax, a corporation having a principal place of business in Walnut, CA; Ritek Global Media/MRT, a corporation having a principal place of business in the City of Industry, CA; Stargate Software, Inc., a corporation having a principal place of business in Huntington Valley, PA; Unik Associates, LLC, a limited liability corporation having a principal place of business in Wauwatosa, WI; Alchemy, Computer, Inc., a corporation dba Global Online Deals 4 All, and Perfection.Com, Inc. a corporation dba Global Online Deals 4 All, both having a principal place of business in Murfreesboro, TN; Disc Copy Labs, a corporation; PC Lab, a corporation, and PC Tech, a corporation, Cross–Claim Defendants.

Civil No. 02–406–KI.

United States District Court, D. Oregon.

July 8, 2003.

See also 286 F.Supp.2d 1278, 2003 WL 22349104.

Alexander C. Johnson, Stephen Scott Ford, Marger Johnson & McCollom, P.C., Portland, OR, Ariana Seldman Hawbecker, Julie E. Hofer, Lawrence K. Rockwell, William R. Hill, Eric Doney, Donahue, Gallagher, Woods & Wood, LLP, Oakland, CA, for Plaintiffs.

Don Finkelstein, Law Offices of Don Finkelstein, Torrance, CA, John. T. Carr, Lake Oswego, OR, for Defendants.

Duane A. Bosworth, Davis Wright Tremaine LLP, Portland, OR, for Warner–Elektra–Atlantic.

Ron St. Marie, Chan Law Group LLC, Los Angeles, CA, Susan D. Marmaduke, Harrang Long Gary Rudnick P.C., Portland, OR, for MRT, Ritek Global Media, and Ritek Global Media/MRT.

Christopher B. Ambrose, Ambrose Law Group, Portland, OR, for Optimax.

David Hanson, Reinhart Boemer Van-Deuren, Milwaukee, WI, Steven M. Wilker, Tonkon Torp, LLP, Portland, OR, for Unik Associates LLC.

Christopher J. Lewis, Jay T. Waldron, Schwabe Williamson & Wyatt, Portland, OR, for Alchemy.

Robert A. Graham, Grants Pass, OR, for Chris Fain.

## OPINION

KING, District Judge.

Plaintiffs Symantec Corporation and Quarterdeck Corporation (together, "Symantec/Quarterdeck") allege that CD Micro, Inc., and its Chief Executive Officer ("CEO"), defendant Vincent Webb, are unlawfully procuring, copying, and selling Symantec/Quarterdeck software products. Symantec/Quarterdeck allege claims for trademark infringement, unfair competition and trademark counterfeiting under the Lanham Act, and copyright infringement. Before the court is Symantec Corporation's and Quarterdeck Corporation's Motion for Summary Judgment or, in the

alternative, Partial Summary Judgment (# 145). For the reasons below, I grant the motion finding CD Micro liable but defer ruling on damages.

## OBJECTIONS TO EVIDENCE

As a preliminary matter, I reviewed CD Micro's Objection to Evidence Submitted although I will not make express rulings on each objection. Some of the objections are more in the nature of argument against Symantec/Quarterdeck's motion and will be considered as such. Other hearsay objections are objecting to actions, which are not hearsay, or objecting to evidence that I will use for notice purposes rather than for the truth of the matter asserted, such as e-mail complaints Symantec received from people who purchased the software at issue here. Some evidence to which CD Micro objects, such as the first two paragraphs of the Quirino Declaration, is also available from other witnesses in forms that are not objectionable. CD Micro also objects to some evidence because it does not believe that it is true. For example, CD Micro states that it never received the letters that Joyce Cartun states that she sent. This is no reason to strike evidence but will be considered as to whether a factual issue exists. Finally, CD Micro objects to the Declarations of Chris Fain and Gordon Dillard and re-counts facts which would provide support for an argument that they are biased against the company. The analysis below does not rely on any evidence provided by either Fain or Dillard.

Symantec/Quarterdeck also objected to some of the evidence proffered by CD Micro. Many of their objections concern evidence on which I do not rely for lack of relevance. Some evidence drawing objection, such as the fact that CD Micro also sells software under license agreements, is not relevant but I have included it as some background information about the company. I disagree with Symantec/Quarterdeck's objection that Steve Daniel's statements concerning the glass mastering process for replicating CDs are improper opinion testimony because Daniel has not been qualified as an expert. Daniel is Vice President of a company that replicates software and owns the equipment about which he is testifying. That is sufficient personal knowledge to support his testimony.

## FACTS

Symantec creates, publishes, and manufactures software designed to protect the security of personal computers. Symantec acquired Quarterdeck on November 16, 1998. Quarterdeck became a wholly-owned subsidiary of Symantec on March 30, 1999.

CD Micro sells software. Vincent Webb is its CEO and majority shareholder. CD Micro acquires licenses to replicate and sell software on the Internet. It also purchases software in bulk on the open market for resale to the public on the Internet.

William Plante, Symantec's Director of World Wide Security and Brand Protection, explained Symantec's process for protecting its intellectual property and selling its software.

Symantec holds Certificates of Registration for the following trademarks: Symantec®, Norton SystemWorks®, Norton Antivirus®, Norton Utilities®, and Norton Ghost®. Quarterdeck holds the Certificate of Registration for Cleansweep®. Symantec's computer software products include Norton SystemWorks® 2001 and 2002 Professional Editions, which are suites of six separate software products including the four trademarked products just listed.

Symantec holds copyright registrations for Norton Antivirus®, Norton Utilities®, and Norton Ghost®. Quarterdeck holds

the copyright registration for Cleansweep®.

Symantec contracts with DisCopyLabs ("DCL") to manufacture and distribute Norton SystemWorks® 2001 and 2002 Professional Editions within the United States. Symantec has a similar relationship with a company named Saturn for distribution outside the United States. Symantec supplies the silk-screen, digital art, and the computer program master to DCL. DCL ensures that the CDs are reproduced according to Symantec's standards. DCL puts the CDs and manuals in packaging designed by Symantec, shrink wraps the box, and ships it according to Symantec instructions.

Symantec also sells some OEM products, that is software without packaging that is bundled with computer hardware. CD Micro submitted copies of another Symantec product, Norton Internet Security 2002, which Webb contends is authentic and which is marked on the label as an OEM product for distribution with new Compaq computers. Symantec's web site discusses its Manufacturers License Program for several products. Norton SystemWorks® Professional Edition is not one of the products mentioned as being available for OEM distribution. In reply to the reference to the Manufacturers License Program, Plante confirms that Norton SystemWorks® Professional Edition software is not now and has never been available to anyone as an OEM product.

Symantec sells Norton SystemWorks® 2001 or 2002 Professional Editions to its distributors at more than $40 per copy. It does not control the resale price and does not sell directly to end users. If a customer is interested in purchasing the software, Symantec directs them to a web site owned by a third party, Digital River, which Symantec licensed to sell the software to end users over the Internet. From September 2001 through March 2002, Plante personally received unsolicited e-mail offers from CD Micro to purchase Norton SystemWorks® 2001 or 2002 Professional Editions at the Free Irewards web site at prices between $19.95 and $29.95. The low prices and marketing method caused Symantec to suspect the authenticity of the product. Symantec was contacted in December 2002 by customers who purchased Norton SystemWorks® 2001 Professional Edition from CD Micro. The customers complained of defects in the copies they had purchased which they believed to be authorized versions.

There are only four authorized replicators in the United States of the 2001 and 2002 Professional Editions of Norton SystemWorks®: DCL, Warner–Electra Manufacturing ("Warner"), Ritek Global Media/MRT ("Ritek"), and Maxell Corporation ("Maxell"). Legitimate software versions replicated by one of these four have particular characteristic marks on the disk or CD.

In February and March 2002, Plante directed investigators from Brand Protection Associates to order 31 copies ("Brand Protection Disks") of Norton SystemWorks® 2002 Professional Edition from CD Micro at its Free–Irewards web site. CD Micro shipped the software without Symantec boxes, manuals, or other materials. Instead, the software was packaged in CD Micro—Free Irewards plastic cases. Plante inspected these Brand Protection Disks. They all had the six trademarks held by Symantec/Quarterdeck affixed to them. Each Brand Protection Disk contained a copy of Norton SystemWorks® 2002 Professional Edition, which includes the software covered by Symantec/Quarterdeck's copyrights.

Plante states that all 31 Brand Protection Disks were unauthorized copies of Norton SystemWorks® 2002 Professional Edition software, based on his inspection.

Sixteen of the Brand Protection Disks had a lowercase "p" in the title in "professional Edition." Eight of the Brand Protection Disks had references to "PC LAB" and "CEI" on the inner mirror band, neither of which is an authorized replicator of Symantec. Seven of the Brand Protection Disks had replicator stamping marks on the inner mirror band were of other companies that are not authorized replicators.

Michael Quirino is a Buyer at DCL who interfaced with the replicators of Symantec software. Quirino examined 3,640 copies of Norton SystemWorks® 2002 Professional Edition software and 3,276 copies of Norton SystemWorks® 2001 Professional Edition software remaining in CD Micro's inventory. All but five of these disks are unauthorized versions of the software for one or more reasons: (1) 2,175 refer to PC Labs and CEI but neither is an authorized replicator; (2) 3,649 have stamping that refers to Ritek, an authorized replicator, but is not consistent with the stamping actually used by Ritek; (3) 1,087 have a lower case "p" in "professional Edition"; and (4) 1,364 misspell "Norton Resc[u]e". The disks all had Symantec/Quarterdeck's trademarks affixed to them.

On October 8, 2001, Joyce Cartun, Director of Legal Affairs for Symantec, sent a letter "To Whom It May Concern" at CD Micro stating that prices significantly below market prices sometimes reflect an illegitimate source and asking CD Micro for the source of the products. She followed up with a second letter on November 19, 2001. CD Micro responded to neither letter.

CD Micro began purchasing Symantec products in late September 2001. Webb explained that CD Micro would compare a sample of software that a company wanted to sell them in bulk with a copy of the software purchased at a large retail outlet. He personally checked the markings on the label on the sample disk and the num-bers on the inner ring, although he did not understand what all of the numbers signified. CD Micro never contacted Symantec to determine who it authorized to manufacture its product. Webb believed that the disks it purchased were authorized by Symantec for several reasons based on his examination of the samples: (1) they were replicated using a glass master process which requires several million dollars of equipment; (2) they contained International Federation of Phonographic Industry anti-piracy information; (3) they identified the replicator and license holder; and (4) they identified the Symantec part number.

Beginning at least by December 2001 and continuing for at least several months, CD Micro received many e-mails from dissatisfied customers complaining that the Symantec software they purchased from CD Micro was pirated and demanding their money back. In some instances, the software had damaged the customers' computer systems.

Several customers who purchased Norton SystemWorks® 2002 Professional Edition from CD Micro, specifically the variation with the lower case "professional" on the label, submitted declarations explaining how they could not get the software to operate. Gary Bollinger had to repurchase the software from another vendor. Dennis Mueller spent two hours with Symantec customer support trying to get the software to operate. Glen Homan attempted to get a refund from CD Micro. As recently as January 2003, CD Micro personnel refused to refund his purchase price and told him that the disk was a legal copy of the OEM software.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.

R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 ‘(1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. *Robi v. Reed*, 173 F.3d 736, 739 (9th Cir.), *cert. denied*, 528 U.S. 952, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999).

## DISCUSSION

### I. *Copyright Infringement*

Symantec/Quarterdeck seek summary judgment of liability only on their claims for copyright infringement under 17 U.S.C. § 101 *et seq.*

■ Plaintiffs must satisfy two requirements to prove a prima facie case of copyright infringement: (1) ownership of the infringed material; and (2) violation of at least one exclusive right granted to copyright holders under 17 U.S.C. § 106. *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir.2001). The exclusive right at issue here is the distribution of copies of the copyrighted work to the public by sale. 17 U.S.C. § 106(3).

CD Micro contends that Symantec/Quarterdeck have not proven that the content of the disks it sold is the copyrighted software. On the contrary, Plante declares that the 31 Brand Protection Disks purchased from CD Micro contain the copyrighted software.

CD Micro also contends that there was no valid transfer to Symantec of the copyright for Norton Ghost® and to Quarterdeck for Cleansweep®.

■ Registration is prima facie evidence of the validity of a copyright. *Three*

*Boys Music Corp. v. Bolton*, 212 F.3d 477, 489 (9th Cir.2000), *cert. denied*, 531 U.S. 1126, 121 S.Ct. 881, 148 L.Ed.2d 790 (2001). Failure to record the assignment of a copyright is not available as a defense to an infringer. *DeSilva Const. Corp. v. Herrald*, 213 F.Supp. 184, 192 (M.D.Fla. 1962).

Symantec submitted copyright registrations in the name of Binary Research Ltd ("Binary") for Ghost® and a written agreement between Binary and Symantec for Symantec to purchase the copyright to Ghost®. Similarly, Quarterdeck submitted the written agreement in which it purchased all rights in Cleansweep® from Pinnacle Software, Inc., and the subsequent copyright registration by Quarterdeck for the software. CD Micro points out that the copyright registration papers show the name of the author as "Quarterdeck Corporation" and the copyright claimant as "Quarterdeck" in a space that also requires a mailing address. I attribute the difference to sloppiness when filling out the form rather than to the possibility that there are two separate legal entities.

I conclude that CD Micro has failed to raise a factual issue concerning Symantec/Quarterdeck's ownership of the copyrights on the software.

Based on the evidence of the distribution of the Brand Protection Disks, the evidence from CD Micro's customers, and the inventory still in possession of CD Micro, I conclude that there is no factual issue and that CD Micro violated Symantec/Quarterdeck's exclusive right to distribute the copyrighted material to the public by sale.

■ CD Micro argues that it falls within the protections of the "first sale" doctrine.

■ Under the first sale doctrine, a sale of a lawfully made copy terminates the copyright holder's authority to interfere

1272

with subsequent sales or distributions of that particular copy. *Parfums Givenchy, Inc. v. Drug Emporium, Inc.*, 38 F.3d 477 (9th Cir.1994), *cert. denied*, 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 197 (1995); 17 U.S.C. § 109(a).

CD Micro's argument suffers from a basic flaw—it is not selling lawfully made copies. All evidence before the court shows that CD Micro was selling copies made by unauthorized replicators. The doctrine grants first sale protection only to copies legally made and sold in the United States. *BMG Music v. Perez*, 952 F.2d 318, 319 (9th Cir.1991) (doctrine does not apply to copies made abroad and exported to the United States), *cert. denied*, 505 U.S. 1206, 112 S.Ct. 2997, 120 L.Ed.2d 873 (1992). Thus, CD Micro's argument is unavailing.

CD Micro argues several other defenses to copyright infringement, including laches.

■ Laches is an equitable defense that prevents a plaintiff who "with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950–51 (9th Cir.2001). To prevail on a laches defense, a defendant must prove that it suffered prejudice as a result of an unreasonable delay by the plaintiff. *Id.*

Laches can bar trademark infringement cases, but the Ninth Circuit "[has] done so only where the trademark holder knowingly allowed the infringing mark to be used without objection for a lengthy period of time." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir.2000) (internal quotation omitted) (citing time period of eight years and two years as sufficient to support laches and ruling that objecting within a few weeks, then filing suit in two months, then filing for a preliminary injunction five months later did not support laches). *See also Brother Records, Inc. v. Jardine*, 318 F.3d 900, 909 (9th Cir.2003)

(notification after two days and filing suit after five months is not adequate delay for laches), *pet. for cert. filed* (June 18, 2003). Typical delays adequate to support laches were found in *Danjaq*, 263 F.3d at 952 (periods ranging from 19 to 36 years are sufficient for laches), and *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir.) (seven years sufficient for laches), *cert. denied*, 537 U.S. 1047, 123 S.Ct. 600, 154 L.Ed.2d 520 (2002).

■ Here, Symantec's Cartun sent a letter to CD Micro asking for an explanation of the source of the software on October 8, approximately two weeks after CD Micro's first sales, and then a follow-up letter on November 19 after CD Micro did not respond. Although CD Micro insists that it never received the letters, or more likely that they got lost in the customer service department, it has no evidence contradicting Cartun's statement that she sent them. Symantec then conducted an investigation, including obtaining the Brand Protection Disks. It filed this action the following March 29, less than six months after CD Micro started its sales. This period is much too short to be consider lengthy enough to support a laches defense, particularly since Symantec did try to contact CD Micro. Moreover, there is evidence that CD Micro was still denying its culpability in January 2003, well after the case was underway. CD Micro was apparently not prejudiced by any delay in Symantec's attempts to shut down its sales. Consequently, I conclude that laches cannot be applied to this situation.

■ A trademark owner has an affirmative duty to take reasonable measures to detect and prevent misleading use of the mark by his licensees or suffer cancellation of his federal registration. *Franchised Stores of New York, Inc. v. Winter*, 394 F.2d 664, 669 (2nd Cir.1968). CD Micro contends that Symantec/Quar-

terdeck breached this duty because some of the disks have references to authorized replicators. There is no evidence, however, that these authorized replicators actually duplicated the disks as opposed to someone else copying the references without permission. Evidence from Quirino concerning Ritek is to the contrary, namely that although Ritek is referenced, the reference is not made in Ritek's authorized stamping style. Therefore, there is no evidence on which to base this argument.

■ Finally, CD Micro argues that Symantec/Quarterdeck gave implied authorization for CD Micro's actions because it has not taken steps against other infringers of which it has knowledge. It cites no authority for this argument and I am aware of none. From the number of conferences I have had with the attorneys in this case, it appears that Symantec/Quarterdeck have been busy prosecuting this action.

I grant summary judgment of liability on Symantec/Quarterdeck's copyright infringement claim.

## II.  *Trademark Infringement*

Symantec/Quarterdeck seek summary judgment for both liability and damages on their trademark infringement claim.

■ To prevail on a trademark infringement claim under the Lanham Act, a plaintiff must prove the existence of a trademark and the use of the mark by another in a manner likely to create consumer confusion. *Comedy III Productions, Inc. v. New Line Cinema,* 200 F.3d 593, 594 (9th Cir.2000). The registration of a trademark "shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce...." 15 U.S.C. § 1115(a).

CD Micro contends that the trademark registration for the mark Cleansweep® is in the name of Quarterdeck Office Systems, Inc., rather than Quarterdeck Corporation, the plaintiff in this action. CD Micro also contends that transfers of the trademark for Ghost® show a break in the title prior to the transfer to Symantec.

In reply concerning Cleansweep®, Quarterdeck provided a certification from the Secretary of State of Delaware that Quarterdeck Office Systems, Inc., changed its name to Quarterdeck Corporation on February 23, 1995. Concerning Ghost®, Symantec provided copies of the documentation assigning the trademark from Gimix, Inc., the original holder, to Darryl Moskowitz and then from Moskowitz to Symantec.

I conclude that there is no factual issue that Symantec/Quarterdeck are the current owners of the six trademarks at issue here. I will turn to the issue of consumer confusion.

■ The central element of trademark infringement, the likelihood of confusion, is the determination of whether "the similarity of the marks is likely to confuse customers about the source of the products." *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 (9th Cir.2000) (internal quotation omitted). The Ninth Circuit relies on the *Sleekcraft* factors when analyzing the likelihood of confusion. Applied here, they are: (1) the similarity of the marks; (2) the relatedness of the two companies' services; (3) the marketing channel used; (4) the strength of Symantec's mark; (5) CD Micro's intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers. *Id.; AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir.1979). The eight-factor test is considered "pliant," meaning that some factors

are much more important than other factors. In the context of the Internet, the three most important factors are the similarity of the marks, the relatedness of the goods or services, and the simultaneous use of the Internet as a marketing channel. *Id.*

██ Here, CD Micro was using marks identical to Symantec/Quarterdeck's marks and intended to sell a product in which the software was identical to Symantec/Quarterdeck's product. CD Micro sold its products on the Internet at the same time that Digital River was selling licensed versions of the software on the Internet. Symantec/Quarterdeck's marks are federally registered and have dates of first use in commerce ranging from 1977 to 1998. There is no evidence that the marks are not strong. There is no evidence that CD Micro unintentionally used a mark identical to Symantec/Quarterdeck's marks. Instead, it chose to copy those marks for the purpose of obtaining sales based on the marks' goodwill. CD Micro continued sales after receiving warnings from multiple customers that they believed the software was pirated. There is evidence in the record that consumers were actually confused and called Symantec to complain about problems with CD Micro's product.

The factor of the likelihood of expansion into other markets is not applicable to this situation. Likewise, I do not see much relevance to the factor of the degree of care likely to be exercised by the purchaser. The trademarks were identical. The software was advertised on CD Micro's web site to be the actual Symantec/Quarterdeck products. The web site even contains numerous boxes of the actual Symantec/Quarterdeck products even though CD Micro did not ship its product in the pictured boxes. The only way a purchaser could be tipped off that the product was not authentic was by the too-good-to-be-true price.

In combination, the *Sleekcraft* factors show that CD Micro's use of the marks was likely to create customer confusion. There is no factual issue here.

CD Micro again relies on the first sale doctrine, which also applies to trademark infringement.

> [T]he right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product. Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition.
>
> ... By guaranteeing that a product will be identified with its producer, it [the first sale doctrine] serves the legitimate purposes of trademark law—the producer gains the good will associated with the quality of its product, and the consumer gets exactly what the consumer bargains for, the genuine product of the particular producer.

*Sebastian International v. Longs Drug Stores*, 53 F.3d 1073, 1074 (9th Cir.), *cert. denied*, 516 U.S. 914, 116 S.Ct. 302, 133 L.Ed.2d 207 (1995).

The first sale doctrine cannot apply to CD Micro's conduct because CD Micro was not selling the genuine product. It sold a CD with Symantec/Quarterdeck's trademarks affixed to it but which apparently did not contain correct and workable software in some cases, and always without the manuals and without a box. This is not the genuine product for which the consumer bargained.

I grant summary judgment of liability on the trademark infringement claim.

Damages will be discussed at the end of this opinion.

### III. *Unfair Competition*

Symantec/Quarterdeck also allege a broader claim under the Lanham Act, for false designation of origin or unfair competition. Again, the likelihood of confusion of the consuming public is the factor to be considered. *See Thane International, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir.2002); *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1201 (9th Cir.1979).

Based on the analysis for the trademark infringement claim, I grant summary judgment of liability on the unfair competition claim.

### IV. *Trademark Counterfeiting*

■ Symantec/Quarterdeck also allege a claim for trademark counterfeiting under the Lanham Act, 15 U.S.C. § 1114(1)(a). The act prohibits the use in commerce, without consent, of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale ... of any goods ... which such use is likely to cause confusion, or to cause mistake, or to deceive." The marks here were identical. I grant summary judgment of liability on the trademark counterfeiting claim.

### V. *Vicarious Liability of Webb*

Vincent Webb, CD Micro's CEO, is also a defendant in this action. Symantec/Quarterdeck contend that Webb is vicariously liable for CD Micro's illegal conduct. Webb offered no argument in response.

■ People or entities may be vicariously liable for copyright infringement if they could control the infringing conduct and obtain a direct financial benefit from it. *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir.1996) (swap meet operator vicariously liable for copyright infringement by the vendors that sell counterfeit music recordings).

■ The evidence shows that Webb is CD Micro's CEO and that he personally inspected sample software products before the company purchased them in bulk. As CEO, he can control the product CD Micro is willing to sell. Here Webb even was personally involved in the decision. This is adequate to meet the control prong of the test. In addition to his salary, Webb is also the majority shareholder and would thus have a direct financial benefit if the infringing sales raise the value of the company's stock. There are no factual issues concerning Webb's vicarious liability. I grant summary judgment against Webb of vicarious liability for copyright infringement.

■ Symantec/Quarterdeck also appear to argue for Webb to be held vicariously liable for CD Micro's trademark infringement. They cite no cases, however, which directly hold that this type of secondary liability is available. *Hard Rock Cafe Licensing v. Concession Services*, 955 F.2d 1143, 1150 (7th Cir.1992), held that secondary liability for trademark infringement must be narrower than for copyright infringement and dismissed a claim for vicarious trademark infringement. I deny the motion for summary judgment for vicarious liability for trademark infringement against Webb.

### VI. *Counterclaims and Cross Claim*

The analysis above also disposes of the counterclaims and cross claim CD Micro alleged against Symantec/Quarterdeck.

Counterclaim One seeks a declaratory judgment that CD Micro's sales do not infringe Symantec/Quarterdeck's copyrights or trademarks and are not unfair competition. Summary judgment is granted against Counterclaim One.

Counterclaim Two seeks to render null and void the copyrights and trademarks of Symantec/Quarterdeck due to their egre-

gious conduct in making false statements that CD Micro is infringing on the copyrights and trademarks of Symantec/Quarterdeck, committing unfair competition, and dealing in counterfeit products. CD Micro gave more specifics on the statements in a response to an interrogatory. Symantec representatives stated that the CD Micro software was unauthorized, was illegal, was not legitimate, was pirated, was not licensed, etc. Counterclaim Three alleges that Symantec/Quarterdeck committed unfair competition by making the false statements. Counterclaim Four alleges a common law trade libel for the same statements. The statements were true. Summary judgment is granted against Counterclaim Two, Three, and Four.

Counterclaim Five alleges a conspiracy between Symantec and Quarterdeck to commit the acts alleged in the other counterclaims. Summary judgment is granted against Counterclaim Five.

Cross Claim One seeks a declaratory judgment that the CD Micro software products were genuine products and not counterfeit products and were authorized and permitted by Symantec/Quarterdeck. Summary judgment is granted against Cross Claim One on behalf of Symantec/Quarterdeck, the Intermediate Parties named in it, and the Third Parties [1] named in it.

## VII. *Damages*

The Lanham Act provides for the following damages:

(a) Profits; damages and costs; attorney fees

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

(b) Treble damages for use of counterfeit mark

In assessing damages under subsection (a) of this section, the court shall,

1. On April 8, 2003, I dismissed Cross Claim One against all Third Party Cross Claim Defendants because Cross Claim One failed to allege a claim against them. I now grant summary judgment on the merits on behalf of all other parties CD Micro alleges the claim against: Symantec/Quarterdeck and the Intermediate Parties Cross Claim Defendants, consisting of Stargate Software, Inc.; Unik Associates, LLC; Alchemy Computer, Inc., dba Global Online Deals 4 All; and Perfection.com, Inc., dba Global Online Deals 4 All.

unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 1114(1)(a) of this title or section 220506 of Title 36 that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services. In such cases, the court may in its discretion award prejudgment interest on such amount at an annual interest rate established under section 6621(a)(2) of Title 26, commencing on the date of the service of the claimant's pleadings setting forth the claim for such entry and ending on the date such entry is made, or for such shorter time as the court deems appropriate.

15 U.S.C. § 1117.

Symantec/Quarterdeck seek summary judgment of damages for only the trademark infringement claim. They submitted proof that CD Micro acquired 194,396 copies of Norton SystemWorks® 2002 Professional Edition software with 3,640 copies remaining in inventory. Likewise, CD Micro acquired 60,063 copies of Norton SystemWorks® 2001 Professional Edition software with 3,276 copies remaining in inventory.

Symantec/Quarterdeck calculate their lost revenue as $40.00 per copy multiplied by at least 231,100 copies. It then deducts CD Micro's costs of $2,029,710 from the total to calculate CD Micro's lost profits at $7,214,290.

Alternatively, Symantec/Quarterdeck seek to have CD Micro disgorge its profit. Symantec/Quarterdeck take CD Micro's total revenue on Norton SystemWorks® 2002 Professional Edition of $5,752,943 minus CD Micro's claimed direct costs of sales of $2,685,849 and indirect costs of $817,198 for an admitted profit of $2,249,896. Symantec/Quarterdeck contend that CD Micro incorrectly claimed costs of legal defense ($82,448) and payroll ($217,166) so CD Micro's profit is actually $2,549,510. The same calculations for Norton SystemWorks® 2001 Professional Edition yields a profit of $785,025. The total for both versions of the software is $3,334,535.

Symantec/Quarterdeck also contend that the court should treble the damages because the evidence shows that the infringement was willful.

CD Micro responds to neither the evidence nor the arguments.

I wish to hear argument on the damages issue, including the initial calculation of damages and the possible trebling of damages, and will schedule time for the parties to present their positions. I also ask CD Micro to be prepared to point to specific factual issues in Symantec/Quarterdeck's damages calculations, in which case a trial on damages might be necessary, or be prepared to concede the calculations.

## VIII. *Other Issues*

There are numerous other issues that must be resolved prior to judgment being entered. I ask the parties to be ready to discuss them during the oral argument on damages:

1. Damages on copyright infringement.

2. Liability of Webb for trademark infringement.

3. The pending Motion to Compel filed by Symantec/Quarterdeck.

4. Cross Claim Two for indemnity.

## CONCLUSION

Symantec Corporation's and Quarterdeck Corporation's Motion for Summary

Judgment or, in the alternative, Partial Summary Judgment (# 145) is granted on the issue of liability.